Argued and submitted November 20, 1985, reversed and remanded July 23, reconsideration denied October 17, petition for review denied November 12, 1986 (302 Or 194)

In the Matter of the Compensation of
Patrick K. Richards, Claimant.

## RICHARDS,
*Petitioner,*

*v.*

## ARGONAUT INSURANCE COMPANIES et al,
*Respondents.*

(82-11053; CA A34477)

723 P2d 327

Robert M. Lusk, Portland, argued the cause for petitioner. With him on the brief was Duncan, Lusk & Strock, Portland.

Patric J. Doherty, Portland, argued the cause for respondents. With him on the brief were Karli L. Olson and Rankin, McMurry, VavRosky & Doherty, Portland.

Before Richardson, Presiding Judge, and Warden and Newman, Judges.

NEWMAN, J.

Warden, J., dissenting.

## NEWMAN, J.

Claimant seeks review of an order of the Workers' Compensation Board which affirmed and adopted an order of the referee which had denied his aggravation claim.[1] We reverse.

Claimant sustained a compensable injury to his right knee on April 16, 1979. He was treated by Dr. Mandiberg, an orthopedic surgeon, who performed a medial meniscectomy on the knee on July 9, 1979. During the operation, he also removed a small fragment of the lateral meniscus. Postoperatively, claimant developed a foreign body infection that required drainage of the knee and two weeks of hospitalization. Thereafter he made a rapid recovery, and on October 3, Mandiberg reported that his "range of motion is excellent and he states that he feels 100 percent." Claimant did not return to Mandiberg for further treatment. His claim was closed by a June 4, 1980, determination order that awarded him 7.5 degrees permanent partial disability for the right knee.

Claimant terminated his employment with employer in November, 1979. He was then employed intermittently in construction work and as a janitor. In August, 1980, while working on a construction project, he slipped and twisted his right knee. He went to an emergency room, from which he was released with these instructions:

> "(1) decrease [weight] bearing, ace bandage (2) off work for 5 days (3) follow up with assigned orthopedist (4) Tylenol II [every] 6 [hours] for pain."

There is no evidence that claimant visited an orthopedist for that injury. His claim was closed in December, 1980, with an award of three days' time loss.

In September, 1982, claimant experienced severe pain in his right knee while playing softball. He quit playing the game and, when the pain did not subside after four or five days, sought medical treatment through a referral service. He

---

[1] ORS 656.273(1) provides:

"(1) After the last award or arrangement of compensation, an injured worker is entitled to additional compensation, including medical services, for worsened conditions resulting from the original injury."

testified that he did not return to Mandiberg initially, because he was dissatisfied with the care that he had received after his 1979 injury. He was referred to Dr. Sirounian, who took x-rays and diagnosed a knee strain. Sirounian, however, recommended that claimant contact Mandiberg so that the x-rays could be compared with the 1979 x-ray.

On September 16, 1982, Mandiberg saw claimant and recorded the following history:

> "Mr. Richards was seen by me about two or three years ago at Kaiser. At that time I did a right medial meniscectomy. I have no other records here as to the exact circumstances of the original injury, although it was a Workmans' Compensation injury. The patient tells me that since his surgery he hasn't been having a problem with his cartilage but he always has grating in his kneecap. That problem was one that he lived with.

> "About a year and a half ago he lost his job due to the general down turn in the economy and he hasn't worked since that time. He has gained about 15 or 20 pounds minimum according to him. He has been playing sports such as softball and racquetball without any difficulty until about a week ago when he heard a pop and his knee gave way on him. Since that time he has had swelling. He saw Dr. Sirounian who evaluated him and told him there was something wrong with his kneecap."

He diagnosed a "chondromalacic problem that [had] been existent for at least 2-3 years," but stated that the injury was unrelated to the 1979 injury. He prescribed medication and instructed claimant to do strengthening exercises and to return in three weeks.

Claimant did not return to Mandiberg but, instead, went to the Sports Medicine Clinic, where he was seen by Dr. Wells, another orthopedic surgeon. He told Wells that, since the 1979 injury, he had had ongoing problems with his knee, particularly after activity. He claimed that, because of that injury, he was no longer able to run without a definite limp and was limited in his ability to play softball.

After his initial consultation with claimant, Wells obtained and reviewed claimant's x-rays, which he found to be incomplete. Eventually, he performed surgery and removed a tear of the lateral meniscus. In a letter to claimant's counsel, he reported on the surgery:

"We eventually got hold of the operative reports, felt that further exploration was warranted and as a consequence, [claimant] underwent arthroscopy by myself on 1-4-83, where a rather complex horizontal cleavage tear of the lateral meniscus *which was obviously old,* extending clear back to the popliteus recess was found, with secondary chondromalacia of the lateral tibial plateau, and also evidence of the previous total medial meniscectomy.

"* * * * *

"Prognosis for recovery is fair, and is fair only because of the rather extensive degenerative damage to the articular cartilege [*sic*] as a result of this meniscal tear, indicating *it was old. The fact that a partial meniscal tear was found at the time of his original arthrotomy would tend to imply that the present knee condition dates back to his injury of April, 1979 and I feel that the evidence would indicate that the initiating factor for his present difficulties is indeed based on that injury."* (Emphasis supplied.)

The insurer solicited Mandiburg's opinion as to the relationship between claimant's 1979 and 1982 injuries. He stated:

"The question is whether the tear of the lateral tibial plateau and the articular cartilage was there as a result of the first injury in 1979, or the result of an injury in 1982. I did note in my 1979 operative report that I removed a tag of cartilage. At that time an arthroscopy revealed no significant tears through the lateral portal. I did not see any significant articular damage at that time. Within two months of his operation he had a full range of motion and was complaining of no significant difficulties. In his office visit to me in 1982, he again complained of no difficulties except for some minimal chondromalacia in the patella area until his injury of September, 1982. In light of that history, the chondromalacia he complained about to me is not of significant importance. *The tear of his lateral meniscus as seen by Dr. Wells may have resulted from his first injury, but there is no way I want to state this.* The interim three years was essentially negative for any meniscal pain, and it was only after his fall in September, 1982, that he began to have problems, according to the history given to me at that time." (Emphasis supplied.)

Wells responded:

"I continue to feel that considering the very tattered nature of the lateral meniscal tear, the secondary articular cartilege [*sic*] damage, that this spoke strongly of the presence of this lesion

over a prolonged period of time, though I am unable to state medically, how long. I would be able to state, however, that they had been there longer than three months.

"I personally did not find Mr. Richards' history to be implausible considering what I saw at arthroscopy and what I have been able to determine from further examinations of him serially.

"* * * * *

"As far as the significance of a symptomatic versus symptoms free interval between 1979 and 1982, since this is largely subjective, and from my viewpoint entirely historical, it will be almost impossible for me to draw very precise conclusions from the information I have available to me. I would only state that if a tear has been initiated within a meniscus, that with time and re-injury, an extension tear tends to occur and this may not be catastrophic or tear all at one instance, but feeling that the initial tear represents a defect from which the lesion can continue, much as a crack or defect in a window of an automobile will tend to perpetuate itself unless stopped by drilling a hole in the end of it or otherwise relieving the stress at that particular point."

"* * * * *

Going back to Dr. Mandiberg's examination, *if this were a true torn meniscus or a tag of torn meniscus* [cartilage] *that was removed, I think it is very likely that there was a tendency for continuation to occur at the level of this defect and that this represents a probable explanation of the findings found in my arthroscopy of 1983.* If this were a synovial tag, having nothing to do with the substance of the meniscus, then my conclusions would have to be different. However, I would again state that it is my opinion that the change in the lateral meniscus was certainly of greater duration than three months." (Emphasis supplied.)

The laboratory report in 1979 indicated that the "tag" of lateral meniscus removed was cartilage, not synovia. Wells and Mandiberg are the only doctors giving opinions in this case. Neither knew of claimant's 1980 injury.

Insurer denied the aggravation claim, and claimant requested a hearing. Consistent with the history that he had given Wells, he testified that he had experienced knee problems intermittently since the 1979 injury. His wife and another witness corroborated his testimony.

The referee affirmed the denial. He did not consider claimant a credible witness and found that the history that he had given Mandiberg was probably accurate. He, therefore, credited Mandiberg's opinion over Wells'. As to Wells' assertion that the underlying injury was "certainly of greater duration than three months," he stated only: "There is no evidence that Dr. Wells was aware of the August, 1980, incident nor that he was aware of all of claimant's athletic and work activities." With one member dissenting, the Board affirmed and adopted the referee's order.

Claimant argues that, even if we accept the Board's finding that he was not a credible witness, he has still proven by objective medical evidence that his 1982 softball injury was an aggravation of his 1979 compensable injury.

In order to prevail on his aggravation claim, claimant must show by a preponderance of the evidence that his compensable injury was a material contributing cause of his worsened condition. ORS 656.273(1); *Grable v. Weyerhaeuser,* 291 Or 387, 401, 631 P2d 768 (1981). If the compensable injury was such a cause, the condition is compensable as an aggravation, even if something else precipitated it. *Taaffe v. SAIF,* 77 Or App 492, 713 P2d 680 (1986).

The preponderance of the medical evidence establishes a causal relationship between the 1979 injury and the 1982 softball injury. Wells stated that the tear in the lateral meniscus clearly predated the softball injury and probably had its genesis in the 1979 injury.[2] He based his opinion primarily on his observations during surgery and on the nature of the previous injury. Although his initial opinion was based in part on claimant's report of his symptoms between 1979 and 1982, he reaffirmed that opinion after learning that claimant may have been "symptom free" during those years.

Mandiberg's opinion that the 1982 injury was unrelated to the 1979 injury, on the other hand, was based almost entirely on claimant's report to him that he had experienced

---

[2] Specifically, Wells believed that the tag of lateral meniscus removed in 1979 was associated with the defect that resulted in the 1982 tear.

little knee discomfort in the interim between the injuries.[3] The validity of that, however, is severely undercut by Wells' observation, which the referee apparently accepted, that the tear was "old." If the tear predated the 1982 injury, it apparently did not cause claimant discomfort before that injury. Accordingly, claimant's lack of symptoms before the softball incident is not evidence that the 1982 injury was unrelated to the 1979 injury. The referee explains Wells' finding that the tear was "old" by citing the 1980 knee injury of which he was unaware. There is, however, *no* medical evidence to support the contention that the damage to claimant's lateral meniscus began with that injury, which, on this record, appears to have been minor.

Claimant had no knee problems before his 1979 injury. There was at least some damage to the lateral meniscus at that time. Dr. Wells indicated that the 1982 tear was old and probably related to the 1979 injury. There was no proof of a serious intervening injury between 1979 and 1982. We find that claimant proved by the preponderance of the evidence that the 1979 injury was a material contributing cause of his 1982 injury, and, accordingly, claimant's aggravation claim is compensable.

Reversed and remanded for acceptance of claim.

**WARDEN, J.,** dissenting.

Because I would affirm the order of the Workers' Compensation Board, I respectfully dissent.

As the majority correctly points out, for claimant to prevail on his aggravation claim, he must prove by a preponderance of the evidence that his 1979 injury was a material contributing cause of the worsening of his knee's condition in 1982. ORS 656.273(1); *Grable v. Weyerhaeuser,* 291 Or 387, 631 P2d 768 (1981). He has not done so.

Both Dr. Mandiberg and Dr. Wells had to rely on histories given by claimant. Mandiberg had performed surgery on claimant's right knee after his 1979 compensable injury

---

[3] In his letter to insurer's counsel, he stated:

"The reason why I felt the patient was most likely suffering from a new injury was because of the relative lack of symptoms between the time of his surgery and the time of his visit."

and found that the range of motion in the knee after treatment was excellent. At that time, claimant told Mandiberg that he felt "100 percent." When his knee "popped" while he was playing softball in September, 1982, he returned to Mandiberg and told him that the only problem he had had with his knee between 1979 and 1982 was "grating in his kneecap." (Apparently, the grating was caused by chondromalacia of the patella found by both Mandiberg and Wells in 1982.) He told Mandiberg that he had been playing softball and racquetball without difficulty until his knee "popped" and gave way about a week earlier. Mandiberg advised claimant that, in his opinion, that was a totally new situation and was not causally connected to his 1979 industrial injury. Claimant failed to keep his next appointment with Mandiberg but consulted with Wells in October.

He told Wells that he had experienced pain during activity ever since the 1979 injury, that he could not run without a limp and that he was not able to play softball. Wells had the impression that claimant had been coaching softball. He did not tell either Wells or Mandiberg of another injury to his knee in 1980.

Before the referee, claimant testified that his knee had given him pain and had swelled with activity ever since the 1979 injury. He never consulted a doctor for it, however, and did not explain why he had not. The referee found claimant not credible. In his opinion he states:

> "Claimant made no effort to explain the difference in the histories he gave Dr. Mandiberg and Dr. Wells. I consider those histories to be irreconcilable. One could argue that after Dr. Mandiberg advised claimant he didn't feel the September, 1982 episode was related to the industrial injury that claimant thereupon modified the history and consulted a different physician."

We give great weight to a referee's finding on the issue of credibility. *Bloomfield v. National Union Ins. Co.,* 72 Or App 126, 694 P2d 1015 (1985).

The referee affirmed the denial of the claim. The Board affirmed the referee. We should affirm the Board, because claimant is not credible and because Wells' opinion, on which the majority relies, is based on an altered, incomplete and partially false history given him by claimant.

I dissent.